# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| DARREN WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>IHS MARKIT LTD. et al.,<br><br>Defendants. | Case No. SA CV 18-02064-DFM<br><br>Findings of Fact and Conclusions of Law |

## I.    INTRODUCTION AND BACKGROUND

Plaintiff Darren Williams filed this action against his former employer to recover a commission bonus of approximately $2.1 million. Williams filed suit against Defendants IHS Market Ltd. and IHS Global, Inc. (collectively "IHS" or "Defendants") in Orange County Superior Court in 2018. See Dkt. 2-1 at 1.[1] IHS removed the case to this Court. See Dkt. 2. The operative corrected First Amended Complaint was filed on December 14, 2018. See Dkt. 18 ("FAC"). Defendants filed their Answer to the FAC on January 24, 2019. See Dkt. 25.

On January 10, 2020, Williams moved for partial summary judgment, and Defendants moved for summary judgment on all causes of action. See Dkts. 34-35. On November 17, 2020, the District Judge assigned to the case

---

[1] All citations to page numbers refer to the CM/ECF pagination.

issued an order denying Williams's motion and granting in part Defendants' motion. See Dkt. 57.

In late 2021, the parties filed pretrial documents, including an Amended Final Pretrial Conference Order. See Dkt. 87 ("PCO"). Per the PCO, Williams has four causes of action remaining against Defendants: (i) breach of written contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) violation of Business and Professions Code §§ 17200 et seq.; and (iv) common counts. See id. at 5-6.

On February 9, 2022, the parties consented to a United States Magistrate Judge and the case was shortly thereafter reassigned to this Court. See Dkts. 96, 98. The Court held a bench trial over several days in September 2022. See Dkts. 110-14, 116. The parties filed closing briefs on November 18, 2022, see Dkt. 130 (Plaintiff's Post Trial Brief ("Pl. PTB")); Dkt. 131 (Defendants' Post Trial Brief ("Def. PTB")), and each side filed a rebuttal brief on November 28, 2022, see Dkt. 132 (Plaintiff's Rebuttal Closing Statement ("Pl. RB")); Dkt. 133 (Defendants' Rebuttal Brief ("Def. RB")). The Court held final arguments on December 8, 2022. See Dkt. 134.

The Court now issues the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.[2]

## II.   FINDINGS OF FACT

### A.   Williams's Employment and Role

1.      IHS is a multinational company that provides "data analysis and services to various companies throughout the automotive industry and its

---

[2] To the extent that any findings are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

supply chain, including in sales, marketing, and the 'aftermarket'." <u>See</u> PCO, Stipulated Fact ("SF") ¶ 1.

2.    From 2007 to May 2020, Williams worked as an employee at IHS or its predecessor, R.L. Polk. After other promotions, Williams became a Senior Sales Executive / Business Development in July 2017. <u>See</u> PCO, Admitted Fact ("AF") ¶¶ 1-2; 1 Trial Tr. (hereinafter "Tr.") at 12-13. Throughout 2017 and 2018, Williams worked in IHS's Automotive Division in Seal Beach, California. <u>See</u> PCO, SF ¶ 2; 4 Tr. at 448-49.

3.    Williams sold information and data to automobile manufacturers, or original equipment manufacturers ("OEMs"). OEMs typically used those products and services in product recall campaigns and recall class actions. Williams's core product was vehicle registration data, but he also sold a variety of related products. Williams had several OEMs assigned to him as his accounts; one of his accounts in 2017 and 2018 was Mazda. <u>See</u> PCO, AF ¶ 3, SF ¶¶ 3-4; 1 Tr. at 14-19; 4 Tr. at 402, 527.

4.    Throughout 2017 and 2018, Williams reported to Mike Ray, who in turn reported to Bryan Funke, the Vice President of the OEM sales department. Funke reported to John McBride, who reported to David Flynn, the Senior Vice President of Global Sales. <u>See</u> PCO, SF ¶ 5; 1 Tr. at 13-14; 2 Tr. at 220-21; 4 Tr. at 400-02.

5.    Williams earned a base salary and was also eligible for commissions (or "sales incentive payments") based on how well he performed in relation to an "annual quota target" or "performance sales goal." IHS set this quota in a Sales Incentive Plan ("SIP") each fiscal year.[3] Williams signed a SIP each fiscal year up to and including 2018. Williams's 2018 SIP governed

---

[3] IHS operated on a December 1-November 30 fiscal year. <u>See</u> PCO, SF ¶ 6; 1 Tr. at 25.

his commission and bonus structure. See PCO, AF ¶ 5-6, SF ¶ 6; 1 Tr. at 19-20; 2 Tr. at 232-34.

**B.    The Sales Incentive Plan**

**1.    Background**

6.    Williams signed two versions of a 2018 SIP—one on March 29, 2018, and one on or around December 18, 2018. The documents are identical except the second version reflects a lower quota for the fourth quarter of 2018. Compare Ex. 3 at 2 with Ex. 84 at 2; see also PCO, AF ¶ 4; SF ¶¶ 6-7.[4]

7.    IHS drafted the SIP. Williams did not have any input into the language of the SIP. The SIPs for salespeople use the same plan language; the differences across SIPs include the annual quotas and commission payment amounts. See PCO, SF ¶ 8; 1 Tr. at 20; see also 2 Tr. at 235-36; 4 Tr. at 407-08.

8.    The 2018 SIP contains a section titled "Plan Objectives" that provides, in relevant part, "The Sales Incentive Plan is designed to motivate and reward sales colleagues for helping the organization achieve and exceed its sales, financial and strategic management goals. Earned incentives are based on individual performance." Ex. 84 at 1.

**2.    Compensation Provisions**

9.    The 2018 SIP contains a section titled "Base Salary," which provides that a salary shall be "[p]aid regardless of quota attainment and considered to be fair compensation for performing 'base line' job duties," including, among others, "[d]eveloping and maintaining effective customer relationships." Id. at 5.

10.    The 2018 SIP includes a section titled "Sales Performance Measures that reads, in relevant part:

---

[4] The Court will cite to Exhibit 84, the version Williams signed on March 29, 2018.

4

As a Participant [i.e., salesperson] assigned to the New Business Sales Rep B AUTO plan, you will earn incentive as you secure sales against your Performance Sales goal according to the following formula:

- Between 0% to 70% attainment: You will earn 0.79% of your Performance Sales OTC for every 1% of goal attainment. For example, if you attain 70% of your goal, you will earn 55% of your Performance Sales OTC.

- Between 70% to 100% attainment: You will earn 1.50% of your Performance Sales OTC for every 1% of goal attainment.

- Beyond 100% of attainment: You will earn 6.67% of your Performance Sales OTC for every incremental 1% above 100%

Id. at 2.

11.    The 2018 SIP defines "OTC" ("On-Target-Commission") as "the amount the Participant will be paid upon reaching 100% of the defined sales performance measures. The OTC is paid based upon sales and target (quota) attainment." Id. at 5.[5]

12.    In the first version of his 2018 SIP, Williams's annual quota target was $4,081,656. In the final version, Williams's annual quota target was $3,825,825. For both versions, the commission Williams would receive if he achieved 100% of his annual quota target was $45,760. See Ex. 84 at 2.

---

[5] The 2018 SIP appears to use the term "Annual Quota Target" elsewhere in the contract to refer to the "Performance Sales OTC." See, e.g., id. at 2 ("Consulting classified products will be in the Participant's annual quota target and will be eligible to retire annual quota target."); see also PCO, AF ¶ 6 (using terms interchangeably). For consistency, the Court uses the term "annual target quota" to refer to both "annual target quota" and "performance sales OTC" under the 2018 SIP.

13.     The "Sales Performance Measures" provision in the 2018 SIP indicates that a sales representative's manager will assign targets for each performance measure for the fiscal year. This provision also indicates that "[t]he Company reserves the right to modify the assigned targets, on a going forward basis, at any time and for any reason, with reasonable notice to the Participant." The SIP does not otherwise explain how annual quota target is set; it also does not identify which specific products or sales are counted toward a salesperson's annual quota target. See Ex. 84 at 2; PCO, SF ¶ 9.

14.     According to witnesses, a salesperson's annual quota target is set based on projected business for that salesperson's assigned region, products, and/or accounts. Setting quota is a "top down" process where management sets a "budget," i.e., the targeted revenue for the coming fiscal year, and the budget is then allocated across business units. Within a business unit, such as the OEM sales department, team-level managers recommend quota targets for individual salespersons based on their knowledge of client business. Ultimately, the final annual quota target calculations are submitted to the Sales Operations team for approval before a SIP is issued to each salesperson. See 1 Tr. at 108-10; 4 Tr. at 449-50, 485-87; 6 Tr. at 688, 705-07, 710-14, 727-28.

15.     The SIP indicates that credit toward annual quota target is not credited until (1) the "net sales have recorded into the Company's financial systems from acceptable contracts/orders submitted by the Participant"; and (2) the "order contract has been fulfilled and billed out." The SIP defines "net sales" as the "12 month booked value of a subscription product contract" or the "invoice value for products classified as 'one-time' or non-reoccurring." The SIP provides that IHS "will advance FY18 Incentives to the Participant 60 days following the end of each fiscal month" based on "FY18 Incentive Eligible net sales achieved year-to-date versus the Participant's annual

Individual Goals." Ex. 84 at 5-6; <u>see also</u> 1 Tr. at 140-41; 2 Tr. at 163-64; 6 Tr. at 668.

      16.    The 2018 SIP includes a section called "Cross-Sell Referrals," which provides:

> For many of the Company's products and services, alternative sales resources or business development colleagues are in place to pursue revenue opportunities. It is imperative for the successful attainment of the Company's revenue goals to leverage, when possible, sales relationships and contacts that have been established within a Participant's client base to provide high quality lead information. The Participant's lead must result in a booked or invoiced sale outside the Participant's core product selling area or geographic responsibility. Participants, who follow the approved process, may be eligible to earn cross sell referral incentive payment. Cross-Selling Referrals do not qualify for retirement of Annual Quota Target.

Ex. 84 at 2.

      17.    This section includes a list of "Cross Sell Referral Rules." One of the rules under this section states:

> The Participant providing the initial lead and considered 'instrumental' in helping assist other domains, product lines, or geographic responsibility outside of the Participant's core products with a sale generating net new business are eligible for cross sell incentives. The Participant is required to document what the Participant considers to be 'instrumental' within the cross sell initiative and will be reviewed by Sales Incentive Plan Administrative, Global Sales Compensation for validity and pre-approval.

<u>Id.</u> at 3; <u>see also</u> PCO, SF ¶ 16.

      18.    The incentive payment for cross-sell referrals in the 2018 SIP is "2% (payout not to exceed 10,000 USD)." Ex. 84 at 2; <u>see also</u> PCO, SF ¶ 16.

      19.    The 2018 SIP includes a provision titled "Special Incentive Programs," which provides, in relevant part, that "[t]hroughout the year, the

company may announce special incentive programs, that provide added incentive rates or replacement incentive rates for a product or services, which it deems a priority to focus additional sales activity." Ex. 84 at 7. IHS and its employees refer to this form of compensation as a "SPIFF." <u>See</u> 1 Tr. at 34; 6 Tr. at 695.

### 3.  Discretionary and Other Provisions

20.    The 2018 SIP includes a section titled "Adjustments to Advances," which provides, in relevant part, that IHS "retains the right to exclude from incentive eligibility any business that it determines in its sole discretion is not reasonably attributable to the efforts or work of the Participant." Ex. 84 at 6.

21.    The 2018 SIP includes a section titled "Assigned Customer Base," which provides, in relevant part: "Sales management assigns customers and products to each individual sales colleague in their sole discretion. Sales territories, customer assignments and product assignments may be changed at any time, for any reason in the sole discretion of sales management. Certain products may be excluded from quota credit and sales target." Ex. 84 at 6-7.

22.    The 2018 SIP includes a section titled "Adjustments to Annual Quota Targets," which provides: "IHS Markit may, at any time, in its sole discretion revise annual quota targets. Annual quota targets may be adjusted among other possible reasons, due to windfalls/losses through accounts transfers, merger, acquisition activity, bankruptcy, long-term contracts, or extraordinary events." Ex. 84 at 7.

23.    The 2018 SIP includes a section titled "Sales Incentive Plan Administrators," which provides, in relevant part: "The Sales Incentive Plan Administrators shall have authority to construe, interpret and to make rules

8

and procedures as deemed necessary, by them in their sole discretion, for proper administration of the Sales Incentive Plan." Ex. 84 at 8.[6]

24.     The 2018 SIP includes a provision titled "Right to Change," which provides in relevant part that "IHS Market retains the sole right, in its sole discretion, at any time to modify, suspend, interpret, or cancel . . . any of the published or unpublished plans, policies, practices or procedures of IHS Market." It also provides that any changes to the SIP "will be deemed ineligible without the written expressed approval of the Sales Incentive Plan Administrators." Ex. 84 at 8.

25.     The 2018 SIP is an integrated contract, stating:

> **Effects of Changes on Prior Plans:** The terms and conditions of this Sales Incentive Plan supersede all previous oral and written communications regarding sales incentives for those employees eligible to participate in the Sales Incentive Plan including, but not limited to, all prior versions of the Sales Incentive Plan, communications in employment offer letters, terms and conditions, and memos as well as verbal or written communications from managers.

Ex. 84 at 8; see also PCO, SF ¶ 20.

**C.     Significant Historical Transactions**

26.     In 2017, Janet Bernard worked as a sales representative in the same office as Williams and received commission under a SIP with similar terms to the 2018 SIPs. During 2017, Bernard closed a transaction with EPIQ, a class action settlement administrator. The deal involved a sale of data to EPIQ, which was used to notify class members of a settlement. The OEMs involved in the class action settlement were Toyota, Mazda, BMW, and

---

[6] In 2018, Gemma Barnes was the Executive Director of Global Sales Commissions and was one of the Sales Incentive Plan Administrators under the 2018 SIPs. See 6 Tr. at 657-58, 679-80, 693; see also 4 Tr. at 481.

Subaru. None of these accounts was assigned to Bernard, and EPIQ was not an account assigned to Bernard or factored into her annual quota target.[7] Bernard received credit for 25% of the transaction against her 2017 annual quota target, while the other 75% was split by the sales representatives assigned to Toyota, Mazda, BMW, and Subaru and credited toward their annual quota targets in proportion to the number of records provided to each OEM. Funke, who was the Vice President of Global Sales Operations for the Automotive Division at the time, assigned Bernard to work on this deal and proposed this method of commission credit. See Ex. 7 at 7-8; PCO, SF ¶ 19; 1 Tr. at 30, 71-72, 116-17, 131; 4 Tr. at 457-60, 518-22, 531-34, 536-38, 552-54; see also 3 Tr. at 322; 6 Tr. at 734-35.

27.     In 2017, Jacqueline Cuda also worked as a sales representative at the same office as Williams and received commission under a 2017 SIP with similar terms to the 2018 SIPs. In 2017, Cuda closed a deal with EPIQ for a class action involving two OEMs, Honda and Nissan. Honda was one of Cuda's assigned OEM accounts; Nissan was not. Like the deal that Bernard closed, this deal involved selling data to EPIQ for EPIQ to use in notifying class members. EPIQ was not an account assigned to Cuda. However, Cuda received credit toward her annual quota target for the portion of the deal attributable to Honda. See 3 Tr. at 292-93, 297-99, 319-21, 327.[8]

_____

[7] In 2017, class action settlement firms like EPIQ were not assigned to any IHS salesperson. See 4 Tr. at 470.

[8] On a separate deal, Cuda sold products directly to Honda, one of her assigned OEMs, in connection with a recall class action. IHS first billed for this deal near the end of 2018. The deal included data, mail, strategy, and call center support. Cuda received credit toward her annual quota target for the data and mail (excluding postage) portions of the deal but did not receive credit for the call center. Cuda testified that she requested credit for the call

28.    In 2017, Nick Porrini worked as a salesperson in a different unit of the Automotive Division at IHS. Porrini sold products to aftermarket suppliers and manufacturers. His role also involved both managing accounts assigned to him and searching for new business opportunities. One of Porrini's assigned accounts was a manufacturer named Takata, and his 2017 SIP included annual quota target for Takata. In 2017, Porrini closed a large transaction with Takata with an estimated value of over $4 million. The transaction was credited toward Porrini's annual quota target of approximately $2 million, and as a result, he greatly exceeded his annual quota target, earning a commission between $200,000-$400,000. See 5 Tr. at 590-91, 595-97.

**D.    Discovery and Development of SSA**

29.    SSA Auto Airbag Settlement LLC ("SSA") was formed to administer a class action settlement involving the recall of Takata brand airbags. The settlement involved various OEMs, including Mazda. See PCO, SF ¶ 12; 1 Tr. at 25; 2 Tr. at 221-22, 236; see also Ex. 22 at 6-8 (email from Williams to IHS employee attaching news article about settlement).

30.    Williams learned about a possible SSA transaction from one of his customers at Mazda, who put Williams in contact with Peter Schmitt, an SSA representative. Williams had his first conversation with Schmitt in October 2017. Schmitt later became IHS's main point of contact at SSA. See 1 Tr. at 26-27; 2 Tr. at 151; see also 4 Tr. at 432-33.

31.    On October 20, 2017, Williams told Funke about SSA. Williams described his initial conversation with Schmitt, and Funke told Williams to run with this opportunity. Following that call, Williams reached out to subject matter experts at IHS and to IHS's legal department, and he arranged further

---

center portion of the deal but was told that portion of the deal "did not have enough margin." 3 Tr. at 299-301, 324-25.

meetings to discuss the potential deal. See 1 Tr. at 28-30, 32, 38-39; see also 4 Tr. at 422-25.

32.     On October 23, 2017, Williams e-mailed Funke with an update on SSA. Williams referenced an earlier meeting and provided a list of details describing the possible business as he understood it at the time. Williams also asked Funke, "how should I proceed with this opportunity? Will this be something like what Janet did earlier this year?" Funke replied the next day, writing "This is gigantic! Please continue to manage and then we will split up by OEM like we did for the E[PIQ] deal that Janet managed." Ex. 85.[9]

33.     Williams took Funke's response to mean that SSA was assigned to Williams and that Williams would receive 25% of any transaction as credit against his annual quota target. See 1 Tr. at 32-34, 92-93; see also 6 Tr. at 768 (confirming that Funke had authority in 2017 to assign accounts).

34.     On October 23, 2017, Williams created an entry for SSA in Salesforce, a software platform used by IHS. The initial estimated deal value he put into Salesforce was $7.29 million. Initially, Williams was not sure what the size of the deal would be; it became clear to him after the first week or two that the deal was "going to be massive." See Ex. 29 at 1-2; Ex. 34 at 1-2; 1 Tr. at 35-37, 102-03, 120; 2 Tr. at 197-98.

35.     When Williams created the Salesforce entry for SSA, he made himself the "opportunity owner." The "opportunity owner" designation is important for commission purposes because Salesforce is used, together with another financial system called SAP, to determine ownership of a sale and

---

[9] At some point, Williams and Funke verbally discussed treating Williams's compensation for SSA like Bernard's compensation for EPIQ. But Funke testified that he meant Williams would receive quota credit in proportion to Mazda's involvement. See 1 Tr. at 28-30; 425-27.

award commission payments. See PCO, AF ¶ 8; Ex. 29 at 1-2; Ex. 34 at 1-2; 1 Tr. at 35-37, 130; 4 Tr. at 451-452; 6 Tr. at 718-21.

36.     Williams initially believed that SSA was requesting a "data dump" of "massive amounts of [vehicle] registration data" associated with vehicles with Takata airbags. However, an October 31, 2017 meeting between IHS and SSA "changed the direction . . . that the opportunity was moving in." Using a slide deck that other employees at IHS had originally prepared for a different client, Williams prepared a presentation for the meeting that set forth a full proposal of what IHS could do. The presentation proposed several new "vaporware" products, that is, "products that IHS would love to create for recall customers" but could not create without a large initial client to pay for development. Williams asked an IHS subject matter expert to present during the meeting, which Funke and Ray also attended. According to Williams, this meeting "fundamentally changed the opportunity from a data only to a true full service recall opportunity."[10] Williams did not confirm with Funke or anyone else whether he would earn incentive-based payment for the new products being presented to SSA. See Ex. 85; 1 Tr. at 39-45, 120-21; 2 Tr. at 151-52, 172-75; 4 Tr. at 402-03.

37.     Over the next several weeks, Williams continued to arrange and join calls and meetings between SSA and IHS. On or around January 19, 2018,

---

[10] Williams distinguished between "data only" recalls and "full service" recalls: For a "data only" recall, IHS receives vehicle identification numbers (frequently referred to as VINs) and provides a customer with names, addresses, and other "appended data" such as e-mail addresses and phone numbers corresponding with the VINs. For a "full service" recall, IHS is also involved in sending first class letters to vehicle owners. Williams testified that he considered SSA's business a "full service" recall but noted that it involved additional components beyond first class letters, including call center services and an artificial intelligence component. See 1 Tr. at 44-45.

SSA signed a four-year Master Services Agreement ("MSA") with IHS with an anticipated approximate deal value of $84.4 million. The MSA was not itself a contract, but instead set forth the terms and conditions governing subsequent purchases by SSA. The anticipated approximate first-year value of the business was $29,402,381. See Ex. 1; Ex. 10 at 1; PCO, SF ¶¶ 10-11; 1 Tr. at 45; 4 Tr. at 433-34, 436; 6 Tr. at 767.

38.     Williams stopped working on the SSA account after the MSA was signed. He was not involved in creating purchase orders or ensuring delivery. In total, Williams spent about 60 hours working on SSA's business. See Ex. 1; 1 Tr. at 42, 105-06, 118-19; see also 4 Tr. at 474-75 (explaining that after initial proposal, effort to secure SSA's business was "really being driven by the Outreach team, the product team and legal").

E.     **The Formation of the Recall Outreach Group**

39.     Before 2018, settlement firms such as SSA or EPIQ had not been assigned to sales representatives as part of their core product selling area. See 4 Tr. at 470.

40.     In the months leading up to the start of fiscal year 2018, and in previous years, IHS sales leadership, including Funke, occasionally discussed how to handle the "space around class actions and settlements." Settlement-related transactions were often "one-off large nature," and revenue was difficult to predict. IHS had seen "a lot of activity in that space," so it considered whether there was "something the organization was missing from [a] business growth opportunity" and whether it should be doing more to "focus [its] efforts in this area to go get business," including "add[ing] people into the organization." 4 Tr. at 437-38, 491-93; see also 2 Tr. at 262-63; Ex. 26 at 1, 17 (email from Hammond to Barnes dated November 14, 2017, with attachment noting that Automotive Division was "[a]dding a new role to

14

centralize the management of recall class action/settlement non OEM revenue").

41.    Once the SSA business opportunity grew, IHS decided to act on those prior discussions and created a new business unit called the Recall Outreach Group ("ROG") beginning in fiscal year 2018. Under this new structure, the ROG would manage sales directly to settlement firms such as EPIQ and SSA, while the OEM sales department would sell products directly to OEMs. With the formation of the ROG, a distinction was drawn between "recall" and "recall outreach" products; the latter category of products included products to contact vehicle owners via phone call, email, and text message. See Ex. 18; 1 Tr. at 56, 90-92, 2 Tr. at 165-68, 262-63, 4 Tr. at 446-48, 493.

42.    IHS assigned Funke to serve as the Vice President of this new business unit. Funke received a raise in this new position and considered it a promotion. Williams was not offered a position in the group. See Ex. 11; 1 Tr. at 57; 2 Tr. at 261-62; 4 Tr. at 401, 482.

43.    On February 5, 2018, Funke held a company-wide meeting to announce the creation of the ROG and new "Sales Plan Structure." Williams and other IHS sales representatives attended this meeting. During the meeting, Funke gave a presentation that explained the ROG and its scope of work moving forward. The presentation outlined how "Outreach/Settlement" would work moving forward; the presentation drew a distinction between "Firm Direct" and "OEM Direct" sales, and it indicated that "[a]ll business direct from class-action settlement firms (i.e., Epiq, SSA,) [sic] is owned by settlement team." The presentation also stated, "No share or SPIFF (SSA exception since it started FY17)." Based on this presentation, Williams understood that all class action recall work would be handled by the ROG moving forward, but he believed based on the SSA "exception" statement that

15

he would receive credit against his annual quota target for SSA's business. See Ex. 18 at 4-5; 1 Tr. at 56-58, 96-98; 3 Tr. at 335-37; 4 Tr. at 457, 493-94, 496, 503-04; 5 Tr. at 607-08.

44.    Quota target for SSA's business was assigned to Funke under the terms of his SIP. No other IHS employee was assigned quota for SSA's business. See 4 Tr. at 438-39; 6 Tr. at 715, 727-28.

45.    Thus, in 2018, IHS no longer gave credit against any salesperson's annual quota for sales to settlement firms like EPIQ or SSA unless the salesperson had the firm's account assigned to them. See 3 Tr. at 385-86; see also 6 Tr. at 734-35.

46.    Some IHS sales representatives had the perception that IHS was taking steps to restrict commissions. Williams believed IHS was "concern[ed] about account executives deserving the commission" associated with class action sales because IHS "didn't feel like [they] had worked hard enough for it." Bernard described Porrini's deal and corresponding commission as "an urban legend" and felt that IHS proceeded to "tighten down" following Porrini's deal. See 1 Tr. at 46-47, 75; 5 Tr. at 549.

**F.    Closing the SSA Deal and Commission**

47.    At some point after IHS made its initial proposal to SSA, Funke became the leader of IHS's efforts to secure SSA's business. Funke spent a large part of his days on the deal. He participated in one to three calls per day about SSA; many of these calls did not include Williams. See 3 Tr. at 344-46, 350; 4 Tr. at 437-39, 482-84.

48.    Funke never expressly told Williams that he was running IHS's efforts to secure SSA's business. Williams was not aware of how much time Funke spent on the deal, as the two worked out of different offices. Funke testified that he believed it "should have been very obvious that [the deal] was moved over to the Recall Outreach Group" because of the announcement of

16

the ROG and because of Funke's level of involvement on the deal. See 1 Tr. at 153-54; 4 Tr. at 453-55, 474-75.

49.     Williams believed that his work on SSA was complete after the MSA was signed. However, according to other IHS witnesses, a salesperson like Williams would typically continue to be involved after an agreement was reached, ensuring that the customer's expectations were met. Funke testified that before SSA, he had never seen Williams stop working on an account before products were delivered and invoiced. See 1 Tr. at 106; 3 Tr. at 310, 314-15; 4 Tr. at 458-60, 477-79.

50.     On February 5, 2018, the same date that IHS held a meeting announcing the creation of the ROG, Flynn sent an e-mail to Hammond with the subject line "OEM Communication." Funke was copied on Flynn's email. Flynn wrote that there would be a telephone call the next morning and listed items that he intended "to get approved by Joe prior to the call." In that list, Flynn included a section labeled "Below for approval but not mentioned on call," and the first item under this list stated, "Finder's Fee for Darren (70k?)." Ex. 5 at 2. Neither Hammond's nor Funke's subsequent messages responded to this point. See id. at 1. Flynn testified that the $70,000 figure was not a formal proposal for what Williams's compensation would be for the SSA business but instead part of the "conversation on how [they] were able to compensate" Williams. See 3 Tr. at 351-53.[11]

51.     At some point in February 2018, Hammond directed Dave Roach, a sales operations director, to change the "opportunity owner" in Salesforce for

_____

[11] Around this time, Flynn and Hammond also engaged in a "self-auditing" process in which the two examined several large commissions that were paid to salespersons in fiscal year 2017 and determined that they needed to take additional steps moving forward to adhere to the terms of the SIPs. See 3 Tr. at 385-87.

SSA from Williams to Funke. Roach did so on March 5, 2018. Hammond instructed Roach to make this change because as part of the quota-building process for 2018, Funke had been assigned the SSA account and corresponding quota (i.e., for annual quota target), and Salesforce was updated to reflect changes in account ownership. See Ex. 29 at 1; Ex. 34 at 1; PCO, AF ¶ 8; 4 Tr. at 454-55; 5 Tr. at 555, 568; 6 Tr. at 717-18.

52.     IHS started delivering services to SSA on March 14, 2018; the deal was considered "closed" on this date. See PCO, AF ¶ 7; Ex. 33; 1 Tr. at 52; 2 Tr. at 223.

53.     Ultimately, the services IHS performed included data and fulfillment services, as well as call center services, e-mail services, and other digital services; IHS worked with a data services company called Acxiom to implement the deal. The total revenue generated from business with SSA during the 2018 fiscal year was around $22 million. Of that, around $6.5 million was attributable to the sale of data and fulfillment services (products that Williams typically sold). Around $14.5 million was attributable to the call center and Acxiom services; revenue from the sale of both of these components was considered "pass-through" revenue.[12] Importantly, the estimated profit margin on the entire deal was around 30 percent; this profit margin was significantly lower than a data-only sale, which, according to Williams, could have estimated margins of around 80-90 percent. See 1 Tr. at 45, 48, 87-89; 2 Tr. at 230-31; 4 Tr. at 402-03, 435; 5 Tr. at 615-17.

54.     On March 15, 2018, Funke e-mailed Flynn about Williams's commission for SSA. Funke told Flynn that he "wanted to discuss the right

---

[12] Several witnesses testified that salespersons do not receive commission payments for "pass-through" revenue, i.e., revenue from sales of products that are billed to a client but carry no profit margin, such as the cost of postage. See 1 Tr. at 86-87; 4 Tr. at 502-03; 5 Tr. at 608-10.

'SPIFF.'" Funke pointed out that Williams, "working diligently with Mazda, uncovered this opportunity," that he "worked the deal directly for the first 6-8 weeks of the initiative," and that the deal was "one of the largest new business contracts" that IHS had signed. Funke then suggested a 1% commission rate based on either the estimated value of the first year of the contract or of the entire contract term; he calculated these figures as $34,692 and $96,285, respectively. At trial, Funke testified that he believed compensation somewhere in this range would be fair. However, Funke's subsequent involvement in discussions about Williams's compensation was limited. See Ex. 10; 4 Tr. at 437, 513-15; see also 2 Tr. at 247 (explaining that "it was predominately [Flynn] working with the Global Sales Operation Team and Christine Hammond" to determine how to compensate Williams).

55.    Witnesses described the approval process for compensation under the 2018 SIP as follows: Barnes, who leads the Central Commissions Team, approved commissions on a monthly basis. Hammond, as Vice President of Global Sales Operations for the Automotive division, acted as an intermediary between the Automotive Division and Barnes's team. Where a unique situation arose regarding compensation, Automotive Division managers were supposed to present the situation to Hammond, and Hammond would make a recommendation to Barnes. Hammond and Barnes would then discuss and reach an agreement. Depending on the amount of compensation, Barnes may have been required to obtain approval from Flynn or potentially from the CFO. See 3 Tr. at 371-72; 6 Tr. at 660-61, 666, 728.

56.    At some point, Flynn, Hammond, and Barnes discussed how to compensate Williams for his work on SSA. According to Flynn, these discussions identified two potential ways to compensate Williams. The first option was to assign him quota for SSA and pay him based on that quota. The second option was to pay a "cross-sell" bonus under the SIP. Because

19

Williams "wasn't going to be running the [SSA] account," those involved in the discussions concluded that assigning Williams quota for SSA "made no sense." 2 Tr. at 244-47; 6 Tr. at 666-67, 723-24.

57.     Barnes recommended a cross-sell bonus based on her understanding of Williams's role in securing the SSA business. She had no firsthand knowledge of Williams's work, but her understanding was that Williams had identified the opportunity and worked on the initial lead. Barnes was aware of the creation of the ROG, and she determined that the products sold to SSA were no longer in Williams's core product selling area, which she defines as the universe of products that the salesperson is allowed to sell. Hammond agreed that the cross-sell bonus was the appropriate form of compensation. To pay Williams a cross-sell bonus of $10,000, Barnes did not need to obtain approval from anyone else. See 2 Tr. at 246-48; 3 Tr. at 371-73; 6 Tr. at 667-69, 678, 726-28; see also PCO, SF ¶¶ 15, 17.

58.     According to Hammond, the group did not consider compensating Williams in the same way Bernard had been compensated for EPIQ because by that time it was clear that sales to settlement firms were "outside of the OEM rep's quota." See 6 Tr. at 734-35.

59.     Williams learned he would be receiving a cross-sell bonus of $10,000 for the SSA business when he met with Flynn on April 25, 2018. After this meeting, Flynn e-mailed Williams, "Just to confirm our conversation today. You will be receiving a $10,000 'cross sell bonus' for identifying the SSA opportunity and passing this to the proper team within IHS Markit." Williams did not agree to receive the cross-sell bonus as compensation for his work on SSA. See Ex. 36; 1 Tr. at 35, 59, 60-61; 2 Tr. at 259-60.

60.     Williams did not consider his efforts to obtain the SSA business as a "cross sell" because "recall"/ "full service recall" were his core product selling areas, and he considered SSA an extension of his core product selling

area. He also had not requested a cross-sell bonus or documented his eligibility for such a bonus in connection with SSA. See 1 Tr. at 60; 2 Tr. at 179-80, 229-30; 6 Tr. at 757-58; see also Ex. 84 at 3.

61.     Shortly after Flynn met with Williams, Williams received the $10,000 cross-sell bonus automatically as a direct deposit. Williams, through counsel, disputed the $10,000 cross-sell bonus payment and demanded payment of a full commission. IHS received notice on or around May 29, 2018, that Williams disputed the amount paid in connection with SSA. See 1 Tr. at 64-65 (stipulation by parties), 67; 2 Tr. at 260.

62.     The only IHS employee who received commission for the SSA business was Funke. Funke received commission based on the terms of his 2018 SIP. Funke's quota target for SSA was initially $5 million but it was later changed to $20 million. He was paid $9,301.94 of commission for SSA's business. This payment was based on credit toward his annual quota target at a rate of $2,450,199 each month across 8 months (March 2018 to October 2018). See PCO, SF ¶ 18; Ex. 69; 2 Tr. at 259; 4 Tr. at 418-20, 444-45, 453; 6 Tr. at 714-15, 761-62, 773.

63.     Williams testified that the time he spent working on SSA hindered his progress on other deals on which he was working. However, Williams did not reach his quota target several of the years that he worked at IHS; the only year he recalled achieving his quota target was 2016. See 2 Tr. at 121. Flynn testified that neither the fact that Williams did not make his quota periodically nor any other issues that IHS may have had with Williams's performance were taken into consideration in deciding to give him a cross-sell bonus for SSA. See 1 Tr. at 218-19; 3 Tr. at 337-38.

64.     In response to complaints by OEM sales representatives that some of their prior sales were being redirected to SSA, IHS issued new 2018 SIPs to these sales representatives; the new SIPs included reduced annual quota target

21

amounts to account for the redirected work. Williams signed the second version of the 2018 SIP in December 2018. <u>See</u> Ex. 3; 2 Tr. at 238-40; 6 Tr. at 736-37.

65.     SSA stopped using IHS's services in 2019. <u>See</u> PCO; SF ¶¶ 11, 13.

## III.    CONCLUSIONS OF LAW

### A.    <u>Breach of Written Contract</u>

66.     To prevail on a claim for breach of contract, a plaintiff must prove the following: (1) the existence of a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) resulting damages to the plaintiff. <u>See</u> <u>Durell v. Sharp Healthcare</u>, 183 Cal. App. 4th 1350, 1367 (2010) (citation omitted).

67.     In order to establish formation of a contract; there must be (i) mutual consent; and (ii) terms that are "sufficiently definite" so that "the performance promised is reasonably certain." <u>Weddington Prods., Inc. v. Flock</u>, 60 Cal. App. 4th 793, 811 (1988). Here, Defendants concede that Williams's 2018 SIP is a contract. <u>See</u> PCO, SF ¶ 6; Def. PTB at 16, 20. Defendants also concede that Williams performed under the contract. <u>See</u> PCO, SF ¶ 10; Def. PTB at 7, 11. Thus, the first two elements are met.

68.     Williams's breach of contract claim turns on whether IHS breached his 2018 SIP by treating his involvement in the SSA business as a cross sell rather than crediting against his 2018 quota. Williams argues that he should have received over $2.1 million in commission rather than the $10,000 cross-sell bonus that he received. <u>See</u> Pl. PTB at 5, 15-18.

### 1.    <u>Interpretation of 2018 SIP</u>

69.     Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. "The language of a contract is to govern

its interpretation, if the language is clear and explicit, and does not involve an absurdity." Id. § 1638. "Although the intent of the parties determines the meaning of the contract . . . the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." Badie v. Bank of Am., 67 Cal. App. 4th 779, 802 n. 9 (1998) (citation omitted).

70.     "A court must first look to the plain meaning of the agreement's language." Buckley v. Terhune, 441 F.3d 688, 695 (9th Cir. 2006) (citing Cal. Civ. Code §§ 1638, 1644). "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649. "This inquiry considers not the subjective belief of the promisor but, rather, the 'objectively reasonable' expectation of the promissee." Buckley, 441 F.3d at 695 (citations omitted). "Parol or extrinsic evidence is admissible to resolve an ambiguity." WYDA Assocs. v. Merner, 42 Cal. App. 4th 1702, 1710 (1996).

71.     Second, the court determines the mutual intention of the parties; specifically, the court considers "objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." People v. Shelton, 37 Cal. 4th 759, 767 (2006). "If after this second inquiry the ambiguity remains, 'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.'" Buckley, 441 F.3d at 695-96 (quoting Cal. Civ. Code § 1654).

72.     Applying this standard, the Court starts with the language of the 2018 SIP. The SIP sets forth Williams's annual quota target and provides a

23

formula for how he would earn incentives in proportion to that target. <u>See</u> Ex. 84 at 2. The SIP identifies certain types of sales that Williams could not credit (or fully credit) toward his annual target quota. <u>See, e.g.</u>, Ex. 84 at 2 (indicating that cross-sell referrals do not qualify for retirement of annual quota target), 4 (limiting annual quota target retirement to first 12 months' contract value for a "Multi-Year Agreement"). The SIP also contains several provisions that give IHS discretion to change Williams's customer assignments, product assignments, and annual quota target. <u>See</u> Ex. 84 at 6-7. Finally, the SIP also makes clear that (i) the Sales Incentive Plan Administrators had the "authority to construe, interpret, and to make rules and procedures as deemed necessary, by them in their sole discretion, for proper administration of the [SIP]"; and (ii) that any "sales incentive agreements" or other changes to the SIPs would be "ineligible without the written expressed approval of the Sales Incentive Plan Administrators." Ex. 84 at 8. The Court does not find any ambiguity in these provisions.

73.     However, while the 2018 SIP sets forth general eligibility requirements and a formula for Williams's commission payments, it does not explain what types of products could be credited toward Williams's annual target quota. The SIP does not reference specific products or specific customer assignments. <u>See</u> PCO, SF ¶ 9; 6 Tr. at 768. With respect to the cross-sell section of the SIP, the SIP makes clear that such referrals do not qualify for retirement of annual quota target, but it is less clear about what would constitute a cross sell for Williams. The SIP states that a salesperson's lead "must result in a booked or invoiced sale outside the Participant's core product selling area or geographic responsibility" but it does not define "core product selling area" or "geographic responsibility." <u>See</u> Ex. 84 at 2. Accordingly, as Judge Staton concluded in ruling on the parties' summary judgment motions, <u>see</u> Dkt. 57 at 8-9, the Court concludes that several material terms in the SIP

are ambiguous. The Court must therefore consider extrinsic evidence to resolve those ambiguities and ascertain what Williams's objectively reasonable expectation was under the SIP with regard to (i) what sales would count toward his annual quota target; and (ii) what sales would be eligible for a cross-sell bonus (i.e., what sales would be considered outside of Williams's "core product selling area" and "geographic responsibility"). See WYDA, 42 Cal. App. 4th at 1710.

74.     Based on the findings of fact, the Court determines that Williams's "core product selling area" and "geographic responsibility" under the 2018 SIP refers to the products that Williams was authorized to sell to his assigned accounts. Barnes, who had authority under the 2018 SIP to interpret its provisions, defined "core product selling area" to mean a salesperson's "product kitbag," or products "within [his] arsenal that [he] can sell." 6 Tr. at 679-80, 693. Williams similarly defined "core product selling area" to mean "products that the salesperson routinely sells." 2 Tr. at 179. Moreover, Funke and Flynn both testified that an OEM sales representative's core responsibilities were linked to their assigned OEM account base. See 4 Tr. at 449-50 (explaining that for OEM sales, "their core responsibilit[ies]" were their "assigned accounts and assigned products"); 5 Tr. at 618-19 ("In our OEM sales organization, you're given basically an account base as your territory.").

75.     In turn, the Court finds that Williams's annual quota target was based on projected sales within Williams's core product selling area. In other words, sales that could be credited against Williams's annual quota target would be sales of products that Williams was authorized to sell to his assigned OEM accounts in fiscal year 2018. See 4 Tr. at 409-11 (explaining that all "qualifying sales" were applied to the annual target quota formula in the SIP, but the sale must be "a product or a customer that was inside their quota to be a qualifying sale"). Thus, the trial evidence shows that Williams's "objectively

reasonable" expectation under the 2018 SIP was that he would receive credit toward his annual quota target for sales that (1) fell within the universe of products he was authorized to sell (subject to IHS's discretion to modify this universe of products); and (2) involved one of his assigned OEM accounts (subject to IHS's discretion to modify Williams's assigned accounts). See Buckley, 441 F.3d at 695 (citations omitted).

76.     The Court next considers the mutual intent of the parties at the time that the parties entered into the agreement in March 2018. See PCO, AF ¶ 4, SF ¶ 6. The stated purpose of the SIP was to motivate and reward Williams for helping IHS "achieve and exceed its sales, financial and strategic management goals." Ex. 84 at 1. As explained above, from the SIP's plain language, the parties also understood that IHS had significant discretion to change the universe of products Williams would sell, as well as his assigned accounts. See Ex. 84 at 6-7.[13] Moreover, IHS specifically had discretion to modify Williams's annual target quota "at any time" in response to unexpected "windfalls" or "extraordinary events." Ex. 84 at 7. This suggests that the parties' mutual intent was to compensate Williams based on his sales performance, up to and potentially beyond his OTC amount of $45,760. See Ex. 84 at 2. However, because the language of the SIP expressly contemplates IHS exercising its discretion to adjust Williams's annual quota target in response to unexpected windfalls, this suggests that it was not the mutual

---

[13] Moreover, Williams also signed a SIP in fiscal year 2017 that contains identical discretionary provisions. Compare Ex. 84 at 2, 6-8 with Ex. 15 at 1, 6, 8; see also 1 Tr. at 19 (indicating that Williams signed prior SIPs). Thus, Williams was already on notice of IHS's discretionary authority when he signed the 2018 SIP.

intent of the parties to award Williams the exact amount generated by the formula in the SIP if he closed an unexpectedly large deal. See Ex. 84 at 7.[14]

77.     Applying this interpretation of the SIP, the Court concludes that IHS did not breach the contract. First, the 2018 SIP did not require IHS to credit the SSA business against Williams's annual quota target. Second, IHS acted within its authority under the 2018 SIP in designating Williams's role in securing the SSA business as a cross sell.

### 2.    The SIP Did Not Require IHS to Award Williams Credit Toward his Annual Quota Target for SSA

78.     The SIP did not require IHS to credit SSA's business against Williams's annual quota target for three reasons.

79.     First, SSA was not one of Williams's assigned accounts when the transaction closed and was never one of the accounts contemplated in his annual quota target. See 6 Tr. at 714-15, 717; see also 4 Tr. at 470 (explaining that no sales representatives were assigned settlement firms in 2017 and as of 2018 the ROG handled deals with settlement firms). As explained above, the trial evidence showed that sales that could be credited against Williams's annual quota target were sales of products that he was authorized to sell to his assigned OEM account base. See 4 Tr. at 409-11. Williams argues that Funke's communications to him in October 2017 were sufficient to assign SSA to him as a client. See Pl. PTB at 9-10, 16. While the evidence suggests that Funke did instruct Williams to work on SSA's potential business when Williams first uncovered the opportunity, the evidence also suggests that at the time, both Williams and Funke understood the deal to involve the sale only of products

---

[14] Williams's subjective expectation when he signed the SIP for each year at IHS was that IHS would abide by the plan and give him "commission commensurate with [his] performance" does not change the conclusion above. See 1 Tr. at 21.

that Williams was authorized to sell (e.g., data). <u>See</u> Ex. 85; 1 Tr. at 39-42; 2 Tr. at 151-52; 4 Tr. at 403; <u>see also</u> 4 Tr. at 449-50 (explaining that if an opportunity like SSA came in that was "an exception, because it's not . . . an account that was assigned to anybody else in the organization," then IHS management could either "assign that to the person that uncovered it or move it around and give them a cross-sell on it").

80.    By the time the SSA business was secured in March 2018, it was clear that SSA was not assigned to Williams. By that time, IHS had announced the creation of the ROG, and while Funke's presentation suggested that an exception could be made for SSA for a "share or SPIFF," the presentation made clear that sales to settlement firms, including SSA, were assigned to the ROG. <u>See</u> Ex. 18 at 4-5; <u>see also</u> 4 Tr. at 503-04; 6 Tr. at 607-08. Funke was heavily involved in the deal, and although Williams may not have had firsthand knowledge of how much time Funke was spending on the deal (since they worked in difference offices), Williams reasonably should have known after the MSA was signed that others at IHS were driving the deal to closure because Williams himself was no longer working on the deal. <u>See</u> 4 Tr. at 432-33, 453-55, 474-75; <u>see also</u> 3 Tr. at 310, 314-15 (explaining salesperson's additional work after deal is signed); 4 Tr. at 477-79, 504-05 (explaining that Williams stopped working on SSA earlier than was expected in his role).[15]

_____

[15] Williams argues that the first version of the 2018 SIP included annual quota target for SSA. <u>See</u> Pl. RB at 2, 4. Williams cites Flynn's testimony, where Flynn testified that Williams's annual quota target was lowered in the second 2018 SIP because of SSA. <u>See</u> <u>id.</u> at 4 (citing 2 Tr. at 240 ("There was recall work that was in Darren's quota that – for Mazda that SSA performed and, therefore, [Williams's] quota was lowered by that amount.")). However, this testimony does not show that Williams had quota target for SSA's business. Rather, as Hammond explained, as a result of SSA, certain sales that previously may have been made directly to OEMs were being redirected to SSA, and to accommodate this change, IHS issued new SIPs to OEM sales

81.    Second, SSA's business involved the sale of products that neither Williams nor any other OEM sales representatives were authorized to sell. As Williams himself acknowledged, he was aware by the time IHS gave its initial proposal to SSA in late October 2017 that the deal would involve products that did not yet exist. See 1 Tr. at 39-42; 2 Tr. at 151-52, 172-75. Williams argues that SSA involved a "full service" recall and thus was within the universe of products he was authorized to sell. See Pl. PTB at 13. However, before Williams signed his 2018 SIP, he knew that SSA's business would include new services performed by a new business unit, the ROG, and that "the products that the Recall Outreach Group was producing [were] not going to be allowed to be sold by senior account executives. They could only be sold by . . . the Recall Outreach Group." 1 Tr. at 77.[16]

82.    Importantly, the evidence showed that those new products, which generated most of the revenue from SSA, differed significantly from Williams's core product because they carried much lower profit margins. See 1 Tr. at 14-15, 45, 48; 5 Tr. at 615-17. Accordingly, although there was some overlap between the products Williams typically sold and the products sold to SSA, the

_____

representatives reflecting a lower quota target. See 6 Tr. at 736-37. Funke was the only employee carrying quota specific to SSA. See 6 Tr. at 714-15.

[16] Williams testified that he believed that Cuda had sold some of the new products developed for SSA to Honda and had received credit toward her annual quota target for the sale of those products. See 1 Tr. at 76-77. However, the trial evidence suggests that Williams was mistaken: Cuda testified that she only received credit toward her annual quota target for the data and mail portions of that deal and that she was specifically told that she could not receive credit for the call center portion of the deal because the margin was too low. See 3 Tr. at 299-301, 324-25. To the extent that Williams expected to receive credit against his annual quota target for products he had been told he could not sell based on a mistaken belief that Cuda received such credit, this was not an objectively reasonable expectation.

SSA business was not a "full service" recall as previously defined. Given this, and in light of the announcement of the ROG, it was not objectively reasonable for Williams to expect when he signed the 2018 SIP that IHS would award him credit against his annual quota target for the sale of all of the products sold to SSA.[17]

83.  Third, based on the findings of fact above, it is not clear that Williams actually "secured" SSA's business under the language of the 2018 SIP. See Ex. 84 at 2 ("[Y]ou will earn incentive as you secure sales against your Performance Sales goal . . . ."). Under the 2018 SIP, quota credit is not credited until, among other things, the net sales "have recorded into the Company's financial systems from the acceptable contracts/orders submitted by the Participant." Ex. 84 at 6. SSA's business did not close for commission purposes until March 2018, but Williams stopped working on the account after the MSA was signed in January 2018. See Ex. 1; 1 Tr. at 105-06, 118-19. The MSA was not itself a purchase order but rather a set of terms and conditions governing future purchase orders. See 4 Tr. at 433-34. Multiple witnesses testified that an OEM sales representative would typically continue working on a deal until it had been delivered. See 3 Tr. at 310, 314-15; 4 Tr. at 477-79, 504-05. Thus, even if SSA's business could have been credited toward Williams's

---

[17] While Williams testified that he believed the statement in the ROG announcement presentation that there would be an "SSA exception" meant that he would receive credit toward his annual quota target for the deal, Funke testified that this was not what he meant when he drafted the presentation. See 1 Tr. at 96-99; 4 Tr. at 496; see also Ex. 18 at 5. Williams did not take steps to confirm with Funke following the presentation that his understanding of this "exception" statement was correct. See 1 Tr. at 99. Accordingly, it was not objectively reasonable for Williams to assume based on this statement that IHS had agreed under the 2018 SIP to credit SSA's business against Williams's annual quota target.

30

annual quota target, it is not clear whether he necessarily would have earned commission on the deal. See Schuman v. IKON Off. Sols., Inc., 232 F. App'x 659, 663 (9th Cir. 2007) (concluding that forfeiture provision of compensation plan was enforceable because although the plaintiff helped develop master services agreement with client, the plaintiff did not execute any sales under agreement, and thus compensation plan did not cause him to forfeit any commissions to which he was otherwise entitled); Remus v. Fios, Inc., No. 11-01264, 2012 WL 707477, at *6-7 (N.D. Cal. Mar. 5, 2012) (holding no breach of contract where (1) the plaintiff's compensation plan did not require the defendant to pay the plaintiff commissions on sales not already made; (2) commission was not earned until sales contract was signed, services were delivered, and customer was invoiced; (3) contract that the plaintiff helped develop was not itself a sale and never generated any revenue). ‼

### 3.   IHS Did Not Breach the 2018 SIP By Designating Williams's Work on SSA as a Cross Sell

84.   IHS's decision to designate Williams's work on SSA as a cross sell was also not a breach of the 2018 SIP. Williams asserts several arguments as to why the SSA could not be treated as a cross sell. First, he argues that the sale was not outside of his "core product selling area or geographic responsibility" because the services sold to SSA were a "full service" recall. See Pl. PTB at 13. However, as discussed above, SSA was not one of Williams's assigned accounts for purposes of annual quota target, and it was clear by the time the SSA business was closed that it would include products that Williams himself understood that he was no longer authorized to sell. See 1 Tr. at 77; see also 1 Tr. at 44-45 (describing SSA as a "full service" recall but noting that it had additional components). Williams also asserts that IHS made SSA part of Williams's core product selling area through Funke's directions at the beginning of the deal. See Pl. RB at 5. But this argument is also unpersuasive,

31

as those directions were given at a stage when both Williams and Funke believed the deal would be data-only. <u>See</u> Ex. 85; 1 Tr. at 39-42; 2 Tr. at 151-152, 172-73; 4 Tr. at 403.[18]

85.     Williams next argues that SSA was not a cross sell for him because (i) Williams and Funke were both in OEM sales "at the time of the SSA opportunity" and (ii) Williams and Funke were in the same division and business unit "when Williams uncovered the SSA opportunity, and he introduced the opportunity to that same division." Pl. PTB at 13. Again, however, when Williams first discovered the opportunity and discussed it with Funke, the deal appeared to be "data only." <u>See</u> Ex. 85; 1 Tr. at 39-42; 2 Tr. at 151-52, 172-73; 4 Tr. at 403. After it became clear that SSA's business would involve far more than just data services, IHS created a new business unit in the ROG to handle SSA's account and other opportunities with similar settlement firms. <u>See</u> Ex. 18; 2 Tr. at 165-68; 4 Tr. at 491-93; 5 Tr. at 607-08. When the deal was closed in March 2018, the ROG was already established, and Funke had ownership of the SSA account. <u>See</u> Ex. 18; Ex. 29 at 1; Ex. 34 at 1; 4 Tr. at 474-75; 6 Tr. at 714-18, 761-62. The trial evidence showed that a cross sell can occur between two departments within the Automotive Division. <u>See</u> 4 Tr. at 448-50; 6 Tr. at 684-86, 694-95; <u>see also</u> Ex. 63, 6 Tr. at 729-30 (explaining that Williams received cross-sell bonuses for assisting the digital sales teams, another team in the Automotive Division). Thus, under the Cross-Sell

---

[18] Williams also contends, to the extent the Court finds that the term "core product selling area" is ambiguous, that the Court must construe the SIP language against IHS because it created the ambiguity. <u>See</u> Pl. PTB at 17. However, this rule does not apply where, as here, other rules of interpretation have resolved the ambiguity. <u>See</u> <u>Buckley</u>, 441 F.3d at 695-96; <u>J. C. Millett Co. v. Distillers Distrib. Corp.</u>, 185 F. Supp. 874, 880 (N.D. Cal. 1960), <u>aff'd</u>, 310 F.2d 162 (9th Cir. 1962).

Referrals section of the SIP, Williams's role in securing SSA's business could be considered a cross sell from the OEM sales department to the ROG.

86.     Finally, Williams argues that his work on SSA's business could not be treated as a cross sell under the SIP because the contract requires a salesperson seeking such a bonus to (1) request a cross-sell bonus; and (2) document why he was "instrumental" and therefore should receive such a bonus. See Pl. PTB at 13. In response, IHS argues that because Williams's managers admitted that he was "instrumental" in developing the SSA opportunity, Williams was not required under the SIP to defend his claim for a cross-sell bonus. See Def. RB at 4. The first rule under the Cross Sell Referral Rules section of the SIP identifies who is eligible to receive a cross-sell bonus and then states, "The Participant is required to document what the Participant considers to be 'instrumental' within the cross sell initiative and will be reviewed by Sales Incentive Plan Administrator, Global Sales Compensation for validity and pre-approval." Ex. 84 at 3 (emphasis added). The contract language thus imposes an obligation on the salesperson for the purpose of allowing the Sales Incentive Plan administrator to evaluate whether a cross-sell bonus should be approved. With respect to Williams and SSA, however, IHS managers made the Sales Incentive Plan Administrator (Barnes) aware of Williams's work on SSA and acknowledged that he was instrumental in discovering the deal. See 2 Tr. at 227-29, 244-47; 4 Tr. at 433; 6 Tr. at 666-67, 723-24. This suggests that it would not be necessary for Williams to request the cross-sell bonus and document why he was entitled to it under the rule in the SIPs. See Wyler Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 662 (9th Cir. 1998) (explaining that a contracting party may waive conditions placed in a contract solely for that party's benefit). In any event, it does not follow that because IHS waived an obligation that would have otherwise been

imposed on Williams under the Cross Sell Referral Rules that SSA must have been a sale that could be credited toward Williams's annual quota target.

87.     While the evidence showed two instances where other OEM sales representatives, Bernard and Cuda, closed deals with a settlement firm (EPIQ) that was not one of their assigned accounts and nonetheless received credit toward their annual quota target for the deal, SSA differed from these two EPIQ transactions in two important respects. First, the two EPIQ sales involved only the sale of recall data, a core product for OEM Sales Representatives that is always factored into their SIPs. See 1 Tr. at 14-15, 131; 3 Tr. at 319-22; 5 Tr. at 554; 6 Tr. at 716. In contrast, as discussed above, SSA's business expanded beyond the universe of products that even existed to IHS at the time, to the point where the bulk of the deal consisted of products that OEM Sales Representatives did not sell and that carried significantly lower profit margins than recall data (and thus would not necessarily have been factored into Williams's 2018 SIP). See 1 Tr. at 39-42, 45, 48, 77; 2 Tr. at 151-52, 169-70, 172-75; 5 Tr. at 615-17; see also 3 Tr. at 299-301, 324-25 (describing inability to receive credit for low-margin call center portion of deal with Honda). Second, due to the sheer size of the deal, the evidence suggests that SSA's business was not something that Williams could single-handedly manage as Cuda and Bernard had managed their smaller transactions with EPIQ; in any event, the evidence showed that as the deal progressed, Funke became more heavily involved in the deal than Williams and eventually became the leader of the deal. See 3 Tr. at 350; 4 Tr. at 437-39, 482-84.

88.     Moreover, while Cuda and Bernard's transactions provide examples of how IHS could have approached Williams's commission for SSA, they do not negate the language of Williams's 2018 SIP, which gives IHS broad discretion in determining commissions. Under the SIP, IHS could have

34

handled Williams's commission in a number of ways.[19] For example, IHS could have added SSA to Williams's assigned accounts and applied the SSA business against his annual quota target, while also adjusting his annual quota target to reflect some or all of the expected value of the SSA business. Adjusting his quota target could have allowed IHS to control or mitigate any windfall that Williams received. Or IHS could have exercised its discretion to award Williams a SPIFF.[20] Or, as it did here, IHS could create a new division to handle a new type of work and transfer customer assignments and the associated quota target accordingly. Given IHS's broad discretion under the SIP, and given the new and different opportunity presented by SSA's business, it was not unreasonable for IHS to respond to SSA by creating a new business unit, assigning SSA to the new business unit's leader, and awarding Williams a cross-sell bonus for his involvement in developing the lead. There is no breach of contract where the "defendants were given the right to do what they did by the express provisions of the contract." Carma Devs. (Cal.), Inc., v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 374 (1992).

89.     Williams characterizes IHS's decision to designate his work on SSA as a cross sell as an attempt to fit a square peg in a round hole. See Williams RB. at 2. While in some respects the Court agrees that SSA does not fit perfectly within the cross-sell section of the SIP (because, for example, the

---

[19] That IHS handled Bernard and Cuda's commission for each EPIQ deal differently further evidences IHS's discretion under the 2018 SIP. See 3 Tr. at 321 (explaining that Cuda received credit toward annual quota target for portion of deal attributable to Honda); 5 Tr. at 536-38 (explaining that Bernard received 25% of total revenue against her annual quota target).

[20] During the hearing on the parties' closing arguments on December 8, 2022, the Court asked Plaintiff's counsel whether any legal ground existed for the Court to conclude that IHS was obligated to award Williams a SPIFF instead of a cross-sell bonus. Plaintiff's counsel could not identify any.

referral "rules" suggest that a salesperson would document why he is entitled to a cross-sell bonus), the Court concludes that IHS acted within its authority under the SIP in classifying Williams's work as a cross sell. While the amount Williams received was lower than he expected and lower than amounts received by some of his colleagues on various other deals, this does not prove that IHS breached the SIP. And even the fact that Williams's own supervisors—Flynn and Funke—thought that the cross-sale bonus was inadequate or even unfair does not prove a breach of contract.

90.     In light of the broad discretion granted to IHS under the contract, the Court cannot reasonably interpret the 2018 SIP to require that IHS apply the approximate first-year value of SSA's business (or 25% of the total deal value) to Williams's annual quota target and award him a commission of over $2.1 million. Accordingly, Williams's breach of contract claim fails.

## B.     Breach of the Implied Covenant of Good Faith and Fair Dealing

91.     To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must prove the following elements: (1) the existence of a contract; (2) the plaintiff performed all, or substantially all, of the significant things the contract required; (3) the conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct. See Guerrero v. Wells Fargo Bank, N.A., No. 10-5095, 2010 WL 8971769, at *5 (C.D. Cal. Sept. 14, 2010).

92.     Under California law, a contract is unenforceable if it is both procedurally and substantively unconscionable. See Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 114 (2000). Procedural unconscionability focuses on "oppression" or "surprise" due to unequal bargaining power, while substantive unconscionability focuses on whether the result of the contract is "overly harsh" or produces "one-sided" results. See id.

"[U]nconscionability requires a substantial degree of unfairness beyond 'a simple old-fashioned bad bargain.'" <u>Baltazar v. Forever 21, Inc.</u>, 62 Cal. 4th 1237, 1244 (2016) (citation omitted). Rather, unconscionable contracts are those that are "so one-sided as to 'shock the conscience.'" <u>Id.</u> (citation omitted).

93.     In addition, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." <u>Carma</u>, 2 Cal. 4th at 371. The covenant applies "where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." <u>Id.</u> at 372. The purpose of the covenant is to "prevent one contracting party from unfairly frustrating the other party's right to receive the <u>benefits of the agreement actually made</u>." <u>Guz v. Bechtel Nat. Inc.</u>, 24 Cal. 4th 317, 349-50 (2000).

94.     When a contract vests discretionary power in one of the parties, that party may "exercise it 'for any purposes within the reasonable contemplation of the parties at the time of formation.'" <u>Carma</u>, 2 Cal. 4th at 372 (citation omitted). However, "implied terms should never be read to vary express terms" of a contract. <u>Id.</u> at 374 (citation omitted). The covenant does not limit a party's discretion to do what is expressly permitted by a contractual provision "except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." <u>Third Story Music, Inc. v. Waits</u>, 41 Cal. App. 4th 798, 808 (1995). "An illusory agreement is one containing words 'in promissory form that promise nothing' and which 'do not purport to put any limitation on the freedom of the alleged promisor.'" <u>Flores v. Am. Seafoods Co.</u>, 335 F.3d 904, 912 (9th Cir. 2003) (citation omitted).

### 1.    The 2018 SIP Was Not Illusory

95.    Williams argues that IHS abused the discretionary provisions in the 2018 SIP by deciding to pay Williams a cross-sell bonus. See Pl. PTB at 18. First, Williams argues that the "Adjustments to Advances" provision in the SIPs, which gives IHS discretion to exclude from incentive eligibility work that IHS determines is not "reasonably attributable to the efforts or work" of a salesperson, cannot be used in this case because IHS admitted that SSA's business was attributable to Williams. See id. at 18-19. He argues that, to the extent IHS used this discretionary provision, IHS impermissibly used it to "change the nature and characterization" of SSA's business to take it outside of Williams's core product selling area and recast it as a cross sell. See id. at 19. This argument is misplaced. The trial evidence does not suggest that IHS invoked this provision in deciding to award Williams a cross-sell bonus. Rather, the evidence suggests that IHS determined that SSA was outside of Williams's core product selling area by the time it closed and thus fell within the Cross-Sell Referrals section of the 2018 SIP. See 2 Tr. at 246-48; 6 Tr. at 667-69; 6 Tr. at 726-28.

96.    Second, Williams argues that the "Assigned Customer Base" provision in the contract, which gives IHS sole discretion to reassign customers, accounts, and products, renders the SIPs unconscionable and illusory. See Pl. PTB at 19-21. Williams argues that the SIPs are procedurally unconscionable because they are contracts of adhesion over which Williams had no bargaining power. See id. at 20. He argues that the SIPs are substantively unconscionable because giving IHS the "ability to assign/re-assign customers, territories, and accounts is a complete one-sided benefit" over which Williams has no control. See id. at 20-21. Williams asks the Court to strike this provision from the SIPs or to apply the covenant of good faith and fair dealing to "save the SIPs from being illusory." Id. at 21.

38

97.    The Court concludes that the "Assigned Customer Base" discretionary provision, on its face, is not so one-sided as to shock the conscience. See Baltazar, 62 Cal. 4th at 1244; see also Schuman, 232 F. App'x at 662-63 (finding compensation plan that included provision allowing employer to change sales representative's territory assignments "at any time for any reason" was not unconscionable). If it were the case that IHS had used its discretion under the SIPs to eliminate all compensation to Williams for his work on SSA, it is possible that the discretionary provisions could be considered unconscionable. For example, in McCollum v. XCare.net, Inc., the defendant employer exercised its discretion under a sales incentive plan to re-assign the plaintiff employee's client "less than two weeks before [a significant deal with the client] was signed," and then terminated the plaintiff, thereby preventing her from receiving any commission at all for her work on that deal. See 212 F. Supp. 2d 1142, 1144-46, 1153 (N.D. Cal. 2002). There, the court highlighted concerns that the defendant's broad interpretation of the discretionary provisions of the sales incentive plan would enable it to "eliminate any obligation to pay earned commissions simply by unilaterally and arbitrarily reassigning the account prior to payment of the commission" and "nullify earned commissions by reassigning an account after the sales contract was signed, but before the commission was actually paid." Id. at 1151, 1153.

98.    Here, unlike in McCollum, SSA was not clearly Williams's assigned client, as Williams did not have SSA formulated into his annual quota target. See 6 Tr. at 761-62. Although SSA's business was ultimately assigned to the ROG, the trial evidence showed that this decision was not arbitrary. See 1 Tr. at 45, 48; 4 Tr. at 437-38, 491-93; 5 Tr. at 615-17. Finally, although Williams challenges whether a cross-sell bonus was the appropriate form of compensation, IHS did compensate Williams under the 2018 SIPs for

39

his work on SSA. Accordingly, unlike in <u>McCollum</u>, the discretionary provisions of the SIPs did not enable IHS to "gain[] the benefit of improved productivity from its salespeople by offering the incentive of potential commissions in addition to earned salary, [while] simultaneously [being] under no obligation to provide the commissions detailed" in the SIPs in connection with SSA. 212 F. Supp. 2d 1151. Moreover, the trial did not reveal evidence suggesting that IHS has exercised its discretion to adjust quota, products, or account assignments in bad faith.

99.    The Court therefore declines to strike the "Assigned Customer Base" provision or any other discretionary provisions from the SIPs. To the extent that the discretionary provisions could be read to allow IHS to eliminate all compensation to Williams for his work on SSA, the Court concludes that the provisions are enforceable as long as IHS was required to exercise its discretion in good faith. <u>See</u> <u>Milenbach v. C.I.R.</u>, 318 F.3d 924, 930 (9th Cir. 2003) ("Under California law, an obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith.").

## 2.    IHS Did Not Breach the Implied Covenant

100.    Williams argues that IHS breached the covenant of good faith and fair dealing by improperly recasting his work on SSA as a cross sell and giving him "woefully inadequate" compensation for his work on the "biggest deal that [IHS] ever signed." Pl. PTB at 22 (quoting 4 Tr. at 437, 512-13). IHS argues that there can be no breach of the implied covenant of good faith and fair dealing because Williams does not allege conduct that is "separate from the conduct resulting in the breach of contract that frustrated the plaintiff's rights." Def. PTB at 25 (citations omitted). Williams's claim hinges on whether IHS's decision to create the ROG, adjust assigned sales territories, customers, or products in light of the formation of the ROG, and designate Williams's

40

work on SSA as a cross sell "unfairly interfered with [Williams's] right to receive the benefits" of the SIPs. See Guerrero, 2010 WL 8971769, at *5.

    101.   Here, the court finds Schwarzkopf v. IBM, Inc., No. 08-2715, 2010 WL 1929625 (N.D. Cal. May 12, 2010), instructive. In Schwarzkopf, the plaintiff, like Williams, worked as a sales representative and earned a base salary plus commission based on sales revenue, and his commission structure was governed by an agreement drafted by the employer-defendant. See id. at *1. The agreement did not cap commission payments but included a "Significant Transactions" clause that gave the defendant sole discretion to adjust commission payments for large deals. See id. at *2. The plaintiff closed a large deal and consequently achieved over 1000% of his quota target for the relevant time period, but his employer decided to limit his commission to 300% of his quota target based on a "300% Rule" that would later be implemented. See id. at *3-4. The plaintiff argued that his employer failed to exercise its discretion in good faith, citing evidence that several managers had told him they thought he should be paid in full; that he had sought information about his potential commission but was never told that the Significant Transactions clause would apply to him; that the final decision to reduce his commission subject to a "300% Rule' was made without consideration of his individual performance; and that this rule was not uniformly applied. See id. at *11. The Court concluded, however, that this evidence did not raise a material question as to whether the employer violated the implied covenant because the language of the Significant Transactions clause expressly permitted the employer's actions. See id. The court also distinguished McCollum on the ground that the plaintiff was "not denied entirely the benefit of the agreement, nor was [the defendant's] exercise of discretion" outside the purposes within the reasonable contemplation of the parties at the time of formation of the agreement. Id. at *12.

102.   Likewise here, IHS exercised its discretion within the express terms of the SIPs, which allow IHS to change "[s]ales territories, customer assignments and product assignments . . . at any time, for any reason in the sole discretion of sales management." Ex. 84 at 6. The 2017 SIP, which included the same discretionary provisions, gave IHS the authority to create the ROG and reassign products, customers, and sales territories to account for the creation of the new group. See Ex. 15 at 1, 6, 8. Given the size and nature of SSA's business, IHS made a business decision to create a new business unit. That decision then led to its decision to exercise its discretion to assign its products and accounts as it deemed necessary. Given the discretionary language in the 2017 SIP and the circumstances surrounding how IHS handled business with SSA, by the time the parties entered into the 2018 SIP, it was within the reasonable contemplation of the parties that IHS might compensate Williams for his work on SSA using a method other than applying credit against his annual target quota (e.g., a SPIFF or cross-sell bonus). Finally, just as in Schwarzkopf, Williams was not denied benefits under the SIP because he received a $10,000 bonus specifically for his work on SSA. See PCO, SF ¶ 17. Accordingly, Williams has not proven a breach of the implied covenant and is not entitled to judgment on this claim.

### C.   Violation of Business and Professions Code §§ 17200 et seq.

103.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq., prohibits business acts or practices that are "unlawful," "unfair," or "fraudulent." Each of these three prongs constitutes a separate and independent cause of action. See Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal.4th 163, 180 (1999) (citations omitted). "While 'a breach of contract may . . . form the predicate for Section 17200 claims,' the § 17200 claim must also 'constitute conduct that is 'unlawful, unfair, or fraudulent.'" Unique Functional Prod., Inc. v. JCA Corp., No. 09-0265, 2012

42

WL 367245, at *5 (S.D. Cal. Feb. 3, 2012) (citing <u>Puentes v. Wells Fargo Home Mortg., Inc.</u>, 160 Cal. App. 4th 638, 645 (2008)). For a practice to be unlawful under the UCL, it must violate another law. <u>Farmers Ins. Exch. v. Superior Court</u>, 2 Cal. 4th 377, 383 (1992) (explaining that UCL "borrows" violations of other law and treats them as unlawful practices independently actionable under § 17200).

104.    The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . ." <u>Searle v. Wyndham Internat., Inc.</u>, 102 Cal. App. 4th 1327, 1334 (2002) (citation omitted).[21] A practice may be deemed unfair even if it is not specifically proscribed by some other law. <u>See Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1143 (2003). The "unfair" standard is intentionally broad, allowing courts maximum discretion to prohibit new schemes to defraud. <u>Motors, Inc. v. Times Mirror Co.</u>, 102 Cal. App. 3d 735, 740 (1980). However, the unfairness prong "does not give the courts a general license to review the fairness of contracts." <u>Searle</u>, 102 Cal. App. 4th at 1334 (citation omitted).

105.    Williams argues that IHS violated the unlawful and unfair prongs of the UCL. <u>See</u> Pl. PTB at 25. First, Williams argues that IHS violated the

---

[21] The Court notes that the test applied under the unfair prong is unsettled. <u>See</u> <u>Yanting Zhang v. Superior Court</u>, 57 Cal. 4th 364, 380 n.9 (2013) (declining to resolve conflicting lower court opinions). However, both parties appear to cite the balancing test as the applicable standard. <u>See</u> Dkt. 87 at 7-8 (citing <u>Progressive W. Ins. Co. v. Yolo Cty. Super. Ct.</u>, 135 Cal. App. 4th 263, 286 (2005)); Def. PTB at 26 (citing <u>McDonald v. Coldwell Banker</u>, 542 F.3d 498, 506 (9th Cir. 2008)). Absent any further discussion of the applicable test, the Court proceeds under the balancing test.

unlawful prong of the UCL because the 2018 SIPs themselves violate Civil Code Section 1670.5 as unconscionable contracts of adhesion. See id. Second, Williams argues that IHS's use of its discretion under the SIPs was unfair under the UCL because it deprived Williams of his "fair, formula-derived commission for the SSA deal . . . ." See id.; see also id. at 22-23 (arguing that IHS's application of discretion to (i) remove SSA from Williams's customer assignments after he had already won the business and SSA had signed the MSA; and (ii) "invent[]" a group after the fact of the sale and "use this false construct as grounds to transform any large sale into a 'Cross-Sale' to deprive salespersons of their SIP benefits" was unfair); Pl. RB at 6 (arguing that IHS sought to use its discretion to eliminate Williams's commission-based payment entirely). IHS argues in opposition to both claims that Williams does not allege anything beyond a straightforward breach of the 2018 SIP and therefore cannot seek relief under the UCL. See Def. PTB at 26; see also Dkt. 87 at 31-32 (asserting as affirmative defense that Williams has not shown he lacks an adequate remedy at law and thus is not entitled to equitable relief).

106.   As an initial matter, in Sonner v. Premier Nutrition Corp., the Ninth Circuit held that "[t]he traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under the UCL . . . in a diversity action." 971 F.3d 834, 844 (9th Cir. 2020) (emphasis added). Williams does not argue, nor did he present any evidence at trial to suggest, that he lacks an adequate remedy at law. See generally Pl. PTB. Williams's UCL claims are duplicative of his contract-based claims; he argues that the 2018 SIP is unlawful and that IHS's breach of the 2018 SIP and its use of discretion to refuse to award Williams commission for SSA's business under the SIP's formula violates the UCL. See id. at 25. The restitution he seeks is the same amount he alleges he is owed under the 2018 SIP. See id. Because

Williams's equitable claims under the UCL are duplicative of his legal claims, and because Williams has not shown that he lacks an adequate remedy at law, his UCL claims should fail on this basis alone. See Williams v. Apple, Inc., No. 19-CV-04700, 2020 WL 6743911, at *10 (N.D. Cal. Nov. 17, 2020) (dismissing false advertising and unfair competition claims because the plaintiff's breach of contract claim provided adequate remedy at law).

107.   However, even considering the merits of Williams's UCL claims, the Court concludes that Williams has not met his burden of proof. First, as to the unlawful prong, Section 1670.5 provides that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause so as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). As discussed above, however, the Court does not find that the 2018 SIP is unconscionable; instead, the Court concludes that the discretionary provisions within the SIP are enforceable as long as IHS exercised its discretion in good faith. See Milenbach, 318 F.3d at 930. Williams therefore fails to show that IHS violated the unlawful prong of the UCL.

108.   Second, the Court does not find that IHS's conduct violated the unfair prong of the UCL. The ROG was not created for the purpose of depriving Williams commission on SSA's business; rather, as the scope of SSA's business grew beyond the OEM sales department, IHS decided to act on prior discussions and create a new business unit specific to settlement firms. See 3 Tr. at 385-87; 4 Tr. at 437-38, 491-93; see also Ex. 26 at 17. While IHS's managers could have taken additional steps to clarify how Williams might be compensated at the time the SSA business was being sought, he ultimately

45

received a bonus of $10,000 for what he estimates was 60 hours of work (in addition to his base salary). See 1 Tr. at 42.[22] The evidence does not suggest that IHS engaged in a scheme to defraud Williams of compensation. Accordingly, Williams is not entitled to judgment on his UCL claims.

**D.    Common Count**

109.    To prevail on a common count claim for services rendered, the plaintiff must prove the following elements: (1) the defendant requested, by words or conduct, that the plaintiff perform services for the benefit of the defendant; (2) the plaintiff performed the services as requested; (3) the defendant promised to pay the plaintiff for the services but failed to do so; and (4) the reasonable value of the services provided. See Ydm Mgmt. Co., Inc. v. Aetna Life Ins. Co., No. 15-00897, 2016 WL 3751943, at *4 (C.D. Cal., July 13, 2016) (citing Judicial Council of California Civil Jury Instruction 371).

110.    In an action for services rendered, "the law implies an agreement to compensate for services rendered and bases recovery upon the reasonable value of the services." Burgermeister v. Wells Fargo Bank & Union Tr. Co., 191 Cal. App. 2d 624, 627 (1961). "[R]ecovery is not on the contract but on the promise the law implies." Id.

111.    Williams argues that IHS, through Funke, directed Williams to pursue and obtain SSA as a client for IHS's benefit but did not pay a reasonable value for Williams's services rendered. Williams argues that the

---

[22] Williams testified that in addition to the 60 hours he spent on the efforts to secure SSA's business, he also had invested over 10 years in his relationship with Mazda and Mazda's employees, an investment that led to the introduction to SSA. See id. However, those 10 years of cultivating the relationship appear to be covered by the "Base Salary" provision of the 2018 SIPs. See Ex. 84 at 5 (providing base salary for "[d]eveloping and maintaining effective customer relationships").

46

$10,000 he received was unfair and inadequate. See Pl. PTB at 24. He reasons that because the total first year value of SSA's business was 7.35 times as large as the value of the Takata deal that Porrini closed, and because the midpoint of Porrini's estimated commission in 2017 was $300,000, the reasonable value of his work on SSA should be the product of these two numbers—$2.205 million. See id. at 24-25. IHS argues in opposition that Williams cannot recover under a common-count theory where "an enforceable, binding agreement exists defining the rights of the parties." Def. PTB at 26 (quoting Paracor Fin., Inc., v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996)).

112.   When a common count is "used as an alternative way of seeking the same recovery demanded in a specific cause of action, and is based on the same facts," the common count claim generally "must stand or fall" with the other cause of action. McBride v. Boughton, 123 Cal. App. 4th 379, 394-95 (2004); see also Zumbrun v. Univ. of S. Cal., 25 Cal. App. 3d 1, 14 (1972) ("[I]f plaintiff is not entitled to recover under one count in a complaint wherein all the facts upon which his demand is based are specifically pleaded, it is proper to sustain a demurrer to a common count set forth in the complaint, the recovery under which is obviously based on the set of facts specifically pleaded in the other count.") (citation omitted).

113.   Here, Williams's common count claim is based on the same facts underlying his breach of contract claim. While the damages figure varies slightly from that of his breach of contract claim, Williams seeks the same recovery in both actions: a higher commission for his work on SSA. See FAC ¶¶ 105-10; PCO at 13; Pl. PTB at 24-25. Thus, because Williams's breach of contract claim fails, his common count claim fails with it. See McBride, 123 Cal. App. 4th at 395; see also AK Futures LLC v. LCF Labs Inc., No. 21-02121, 2022 WL 2784409, at *12 (C.D. Cal. June 24, 2022) (dismissing common count counterclaim for services rendered because breach of contract

counterclaim failed); <u>Alfino v. Litton Loan Servicing, LP</u>, No. 11-01034, 2011 WL 13225023, at *12 (C.D. Cal. Aug. 24, 2011) (dismissing common count mistaken receipt claim where the plaintiffs' allegations were exclusively related to contract claim).

114.   The existence of an express agreement governing a plaintiff's compensation does not automatically prevent a plaintiff from pursuing a claim for fair compensation for services rendered. For example, in <u>Atencio v. TuneCore, Inc.</u>, the court denied a motion to dismiss the plaintiff's common count claim despite dismissing the breach of contract claim because a "lack of clarity in the deadline for exercise" of stock option compensation under the contract left the plaintiff effectively uncompensated for services rendered. No. 16-1925, 2018 WL 6164787, at *11 (C.D. Cal. Sept. 21, 2018), <u>aff'd</u>, 843 F. App'x 42 (9th Cir. 2021). However, unlike the plaintiff in <u>Atencio</u>, Williams has not been left effectively uncompensated for his work; instead, he has received $10,000 for 60 hours of work. <u>See</u> PCO, SF ¶ 17; 1 Tr. at 42. Williams insists that the value of his work on SSA is $2.205 million based on what Porrini received in connection with his deal with Takata, but this figure fails to take into account that Porrini <u>spent a large part of his workday on this deal for approximately 9-11 months</u>. <u>See</u> 5 Tr. at 600-01.[23] While the number of hours worked on a deal may not have affected whether a deal could be credited toward annual quota target, <u>see</u> Pl. RB at 2, the number of hours worked is relevant in determining the reasonable value of services rendered. Additionally, there is no evidence that Porrini's transaction involved products with lower profit margins like the recall outreach products that made up the

---

[23] It is also unclear from the trial evidence whether the estimate Porrini provided was specific to the Takata deal or reflected the total amount of commission he received in 2017; the latter would include all other deals credited toward his annual quota target. <u>See</u> 5 Tr. at 590-92.

majority of SSA's business. Accordingly, the Court is unpersuaded that $2.205 million is a reasonable estimate for the value of Williams's work on SSA. Williams has not shown that IHS failed to pay him a reasonable amount for his work. Accordingly, Williams is not entitled to judgment on his common count claim.

## IV.   CONCLUSION

For the reasons stated above, the Court enters its findings of fact and conclusions of law as stated herein. Defendants shall file a proposed judgment forthwith. Plaintiff shall file any objections thereto within 7 days. If no objections are received within 7 days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of judgment.

Date: January 19, 2023

DOUGLAS F. McCORMICK
United States Magistrate Judge

49